# CASES

IN THE

# APPELLATE COURTS OF ILLINOIS.

## SECOND DISTRICT—OCTOBER TERM, 1901.

101 575'
s112 524

### Charles A. Walker v. Ella Dailey.

1. INSTRUCTIONS—*In an Action Under the Dram-Shop Act for Selling Lemon Extract.*—In an action under the dram-shop act, for causing the death of the plaintiff's husband by selling him a bottle of lemon extract, an instruction, given at the instance of the plaintiff, that if the extract contained such an amount of alcohol that the alcohol remained as a distinctive and controlling, effective force and active principle of the mixture, and its intoxicating power was not counteracted by the oil of lemon—if the mixture retained the intoxicating qualities of the alcohol and had not been rendered undesirable for use as a beverage, and if it might fairly be presumed that it might be, and was reasonably liable to be, used as an intoxicating drink, and if the defendant's clerk sold a bottle of such lemon extract to the deceased and it wholly or in part caused his intoxication and the plaintiff was injured thereby in her means of support, she was entitled to recover, ignores the question as to whether such lemon extract was sold to the deceased in good faith for culinary purposes and does not make it necessary that it should appear that he or his clerk was selling such extract as a shift or device to evade the provisions of the law, and is improper as not requiring proof that the defendant or his clerk had any knowledge that the deceased ever drank lemon extract, or that he bought the particular bottle for that purpose, and should not have been given.

2. STATUTES—*Construction of the Dram-Shop Act.*—The act to provide for the licensing of, and against the evils arising from, the sale of intoxicating liquors, commonly known as the "dram-shop act," is penal in its character and must be strictly construed. The law should receive a reasonable construction.

3. DRAM-SHOP ACT—*What Liquors Are Included in Its Terms.*—The mere presence of alcohol in an article sold to a customer by a coun-

(575)

try merchant or his clerk, in good faith and not as a shift or device to evade the law, is not to be deemed an intoxicating liquor within the meaning of the act to provide for the licensing of, and against the evils arising from, the sale of intoxicating liquors, simply because the customer to whom it was sold drinks it and becomes intoxicated.

4. SAME—*Lemon Extract—Sale of.*—The sale of lemon extract by a merchant in the ordinary course of his business, not made as a shift or device to evade the provisions of the dram-shop act and without intending it shall be used as a beverage and without knowing that it is contemplated by the purchaser that it is to be used for that purpose, and in the absence of proof that it is an article commonly used as a beverage, does not render the vender liable under the dram-shop act of this State.

**Action Under the Dram-Shop Act.**—Appeal from the Circuit Court of Knox County; the Hon. GEORGE W. THOMPSON, Judge, presiding. Heard in this court at the October term, 1901. Reversed and remanded. Opinion filed April 11, 1902.

J. A. McKENZIE, attorney for appellant.

SHUMWAY & RICE, FLETCHER CARNEY and J. W. CARNEY, attorneys for appellee.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

Mrs. Ella Dailey brought this action against Charles Walker and Henderson Woods, to recover damages for injury to her means of support, resulting from the death of her husband, Samuel M. Dailey, caused by his intoxication, alleged to have been produced by defendants. Defendants pleaded not guilty. During the trial plaintiff dismissed her suit as to Woods. Plaintiff recovered a verdict for $2,000, remitted $500, and had judgment for $1,500. Defendant appeals.

Walker was a merchant in Maquon. He kept for sale, at retail, dry goods, boots and shoes, groceries and general merchandise. He did not profess to sell or keep for sale intoxicating liquors, as such. Among his stock of groceries he kept and sold lemon extract. He bought his stock of lemon extract from a wholesale grocery house in Peoria. He kept and sold it for culinary purposes, to be used in flavoring foods. On a certain Saturday Mr. and Mrs. Dailey were in defendant's store buying groceries. Dailey bought

an eight-ounce bottle of lemon extract and put it in his pocket, without his wife's knowledge. After they left the store they separated, and she went home. He obtained from some other source a bottle of whisky or a bottle of Hostetter's bitters, or both, and during that and the succeeding day drank the contents of such other bottle or bottles, and drank half or three-fourths of said bottle of lemon extract. He was under the influence of the liquor Saturday evening and Sunday, was taken very ill Monday, and died Tuesday morning. A post mortem examination was held, and his physicians testified the post mortem showed he died of chronic alcoholism.

The proof shows that lemon extract is about ninety-five per cent alcohol, the legitimate office of the alcohol being to cut and preserve the oil of lemon, which constitutes the rest of the compound. Lemon extract is a well-known article of merchandise, and its legitimate use is for flavoring purposes. It is not ordinarily classed or known as an intoxicating beverage, nor is it ordinarily kept for sale or sold as an intoxicant. It, however, contains sufficient alcohol to intoxicate if used as a drink, and the oil of lemon it contains does not radically change the alcohol so as to make it wholly unfit for a drink. The proof shows some men do drink it. The theory of the trial court, as indicated by the fourth instruction given at plaintiff's request, and by modifications by the court of several instructions requested by defendant, was that if this extract contained such an amount of alcohol that the alcohol remained as a distinctive and controlling effective force and active principle of the mixture, and its intoxicating power was not counteracted by the oil of lemon, and if the mixture retained the intoxicating qualities of the alcohol and had not been rendered undesirable for use as a beverage, and if it might fairly be presumed that it might be and was reasonably liable to be used as an intoxicating drink, and if defendant's clerk sold a bottle of such lemon extract to Dailey, and it wholly or in part caused Dailey's intoxication, and plaintiff was thereby injured in her means of support, she was entitled to recover. This

ignored entirely the question whether the lemon extract
was sold to Dailey in good faith for culinary purposes, and
did not make it necessary it should appear that defendant
or his clerk was selling lemon extract as a shift or device
to evade the provisions of the dram-shop act, nor did it
require that defendant or his clerk should have had any
knowledge that Dailey ever drank lemon extract, or that
he bought this particular bottle for that purpose.

Under these instructions no merchant can sell any article
put up for toilet or culinary purposes which contains alco-
hol in sufficient quantity to intoxicate, if used as a drink,
without a license to keep a dram-shop, unless the other
ingredients render the article undesirable for use as a bev-
erage.   We can not concur in this view.   The entire dram-
shop act, including section 9, under which this suit is
brought, is "aimed at dram-shops, and those who are
engaged, either lawfully or unlawfully, directly or indi-
rectly, in the liquor traffic." (Cruse v. Aden, 127 Ill. 231.)
If defendant kept and sold lemon extract for culinary
purposes only, and if this sale was made without knowl-
edge by defendant or his clerk that it was bought for the
purpose of using it as an intoxicating beverage, defendant
should not be held liable for the use of the article made by
Dailey after he left the store.   If, on the other hand,
defendant was keeping and selling lemon extract as a mere
shift or device to evade the provisions of the dram-shop
act, or if defendant or his clerk knew when he sold it that
this particular bottle was bought by Dailey for use as a
drink, then defendant should be held liable, if the other
features of a cause of action in plaintiff exist, namely, if
Dailey did drink the lemon extract so bought, and if it did
contribute to his intoxication, and if from that intoxica-
tion plaintiff was injured in her means of support.   In the
case of such a merchant we regard the question whether
the sale was a shift or device to evade the law of control-
ling importance.   (Holcomb v. The People, 49 Ill. App. 73.)
It should be noted in this connection that some of the
instructions requested by defendant were imperfect in mak-
ing the case turn upon the intention of defendant, ignor-

ing his clerk. If the clerk who sold this bottle of lemon extract knew it was bought for use as an intoxicant, or if he was engaged in an evasion of the dram-shop act, the employer would be liable for the actual damages sustained by plaintiff by the act of the clerk, even if unauthorized. Keedy v. Howe, 72 Ill. 133; Layton v. Deck, 63 Ill. App. 553.

There was no proof defendant ever sold or authorized the sale of lemon extract for use as an intoxicant. There is proof that the year before Dailey's death a clerk of defendant sold Dailey some goods, including a bottle of lemon extract, and seeing him go out of the back door with it, watched him, and saw him drink it all. The clerk did not mention this to defendant, and he was not in defendant's employ when the sale now in question was made. There is proof having some tendency to show that the clerk who sold Dailey the bottle in question had reason to suspect it was not intended for ordinary domestic use. As the case must be tried again we deem it unnecessary to discuss the evidence further. There were some inaccuracies in the rulings upon the evidence. Mrs. Clark should not have been permitted to testify that she once sent defendant a written notice upon some subject. A druggist should not have been permitted to testify that in a town where a license to sell liquor was not granted, lemon extract could be sold as a substitute for intoxicating drink, nor should a medical expert have been permitted to testify that in such a town the sale of lemon extract would afford to one accustomed to use alcoholic drinks as a beverage an opportunity to procure such a drink. Such testimony invited the jury to suspect and infer, without proof, that defendant or his clerk did in fact sell lemon extract for use as a beverage, or did in fact keep that commodity as a shift or device to evade the provisions of the dram-shop act.

The judgment is reversed and the cause remanded for a new trial.

Mr. JUSTICE BROWN delivered the following additional opinion:

Charles A. Walker is the proprietor of a general store in

the village of Maquon, in which he sells at retail, only, both dry goods and groceries. The character of his business is that of an ordinary merchant in a country town. May 19, 1900, Walker, through a clerk, sold Samuel M. Dailey, who was a regular customer at his store, an eight-ounce bottle of lemon extract of the Anchor Brand, in connection with the purchase by Dailey and his wife of various other articles of merchandise.

There is some proof tending to show that the sale was made without the knowledge of Mrs. Dailey and under circumstances, if true, tending to show that Dailey did not want her to know he had made the purchase. But this proof was very slight and is of a character not susceptible of being contradicted in view of the death of Dailey.

On the same day Dailey elsewhere purchased a quart of whisky. After leaving the store of Walker, and unbeknown to him, Dailey drank portions of the lemon extract and after returning to the farm upon which he resided he continued to drink the lemon extract and whisky until a little less than half of the extract was exhausted, on the 22d day of May, 1900, when he died. The autopsy disclosed the fact that his death resulted from chronic alcoholism.

Dailey was forty-three years old and his wife about six or seven years younger. Nothing can be said against him in his domestic relations except that he was addicted to the excessive use of intoxicants. He was a tenant farmer by occupation and provided well for his family, which consisted of his wife and four children ranging from four to eighteen years of age.

Ella Dailey, the wife of decedent, brought this suit in the Circuit Court of Knox County against Walker to recover damages under the dram-shop act for the loss of her means of support resulting from the death of her husband.

The trial resulted in a verdict in her favor for $2,000. She remitted $500 and judgment was rendered for $1,500. The defendant brings the case to this court by appeal.

Upon the facts in this record the plaintiff was not entitled to recover a judgment against defendant.

The statute under which this case is prosecuted defines a

Walker v. Dailey.

dram-shop as a place where spirituous, malt or vinous liquors are retailed in less quantities than one gallon.

The statute also provides, that whoever, not having a license to keep a dram-shop, shall, by himself or another, either as principal, clerk or servant, directly or indirectly, sell any intoxicating liquor in any less quantity than one gallon, or in any quantity to be drank upon the premises, or in or upon any adjacent room, building, yard, premises, or place of public resort, shall be fined not less than twenty dollars ($20), nor more than one hundred dollars ($100), or imprisoned in the county jail not less than ten nor more than thirty days, or both, in the discretion of the court; and that every husband, wife, child, parent, guardian, employer or other person, who shall be injured in person or property or means of support, by any intoxicated person, or in consequence of the intoxication, habitual or otherwise, of any person, shall have a right of action in his or her own name, severally or jointly, against any person or persons who shall, by selling or giving intoxicating liquors, have caused the intoxication, in whole or in part, of such person or persons.

In a case in which exemplary damages are not claimed, the fact that the sale was made by a clerk of the defendant without his knowledge or consent would be unavailing as a defense if the facts were otherwise sufficient to meet the requirements of the law. Mayers v. Smith, 121 Ill. 442; Layton v. Deck, 63 Ill. App. 553; Keedy v. Howe, 72 Ill. 133.

It is equally unavailing to show that the intoxication or death was caused in part by others, not defendants to the suit. O'Halloran v. Kingston, 16 Ill. App. 660; O'Leary v. Frisbey, 17 Ill. App. 553; Coleman v. People, 78 Ill. App. 210.

Independent of the sale of the lemon extract there is no pretense that Walker kept or dealt in intoxicating liquors or was the keeper of a dram-shop or was guilty of any shift or device to evade the provisions of the statute relating thereto.

The evidence shows that the lemon extract sold to Dailey

was manufactured by a reputable firm in Peoria, Illinois, and extensively sold throughout the country in the regular course of trade by merchants for culinary purposes and fails to show that the defendant kept or sold it for any other purpose. It contained a sufficient quantity of alcohol to render it intoxicating if used as a beverage.

The dram-shop act now under consideration went into force July 1, 1874, and is entitled "An act to provide for the licensing of and against the evils arising from the sale of intoxicating liquors."

It is penal in character and must be strictly construed. A party seeking its benefits must conform strictly to its provisions.

In Carl v. The State, 87 Ala. 17, which was a prosecution for a violation of a liquor law similar to our own statute, the court said:

"The purpose of prohibitory liquor laws is to promote the cause of temperance and prevent drunkenness. The mode adopted to accomplish this end is the prevention of the sale, the giving away, or other disposition of intoxicating liquors. The evil to be remedied is the use of intoxicating liquors as a beverage, rather than as an ingredient of medicines and articles for toilet or for culinary purposes; and the object of the law in this particular must not be lost sight of in its interpretation. * * * The mere presence of the alcohol does not bring the article within the prohibition."

The construction of the prohibitory amendment and legislative enactments of Kansas is to be found in an opinion of the Supreme Court of that State rendered in a consolidation of a number of prosecutions for various alleged violations of the statute. It is reported under the title of "Intoxicating Liquor Cases," 25 Kan. 751. Mr. Justice Brewer, now on the Federal Supreme Bench, delivered the opinion of the court as follows:

"We now pass to the second branch of these cases, the inquiry as to the scope and extent of the statute. What liquors, using that term in its broadest sense, are included? The first section prohibits the manufacture or sale of any spirituous, malt, vinous, fermented, or other intoxicating

Walker v. Dailey.

liquors. Now, this language is broad and comprehensive. 'Other intoxicating liquors' extends the scope so as to include every liquor which comes within the general definition of intoxicating liquor. And yet, if this section stodd alone, there would be little doubt as to its meaning. It would include only such liquors as are used as a beverage. No one would think of extending it to cologne, extract of lemon, or any of those many preparations which, although they contain alcohol, the intoxicating factor in all drinks, are never used as beverages. But Sec. 10 casts the doubt upon the statute. It reads: 'All liquors mentioned in section one of this act, and all other liquors or mixtures thereof, by whatever name called, that will produce intoxication, shall be considered and held to be intoxicating liquors within the meaning of this act.' This section, whose language is uniformly chosen, is the one which has provoked this litigation, and has tended to create so much prejudice against the statute; for this letter reaches to preparations which no man can believe were within the intent of the legislature, and any interference with whose sale, if within the power of the legislature, would be felt by every one to be unnecessary and unreasonable. Alcohol is the intoxicating principle—the basis of all intoxicating drinks. Whatever contains alcohol will, if a sufficient quantity be taken, produce intoxication. Hence, whatever liquor contains alcohol is within the statute. So reads this letter. But when we come to inquire as to the liquors which contain alcohol, we find a lengthy list of fluids which are never used as beverages. Cologne, extract of lemon, bay rum, paregoric, tincture of gentian and many other medicinal preparations contain alcohol, and all will produce intoxication. They are seldom used as a beverage, and yet they may be. Intoxication produced by drinking bay rum has been known. Yet few will drink it. But three of the cases before us are for prosecutions for the sale of bay rum, essence of lemon and tincture of gentian, respectively. These preparations contain alcohol, and will each, it is charged, produce intoxication. If the statute includes such articles, many of them are absolutely and wholly shut out from sale. The excepted purposes in the statute are 'medical, scientific and mechanical.' But toilet and culinary purposes are strictly included within no one of the three. The lady who desires cologne for her toilet purposes can not get a physician's prescription therefor, nor file an affidavit that she wants it for scientific or mechanical purposes, and yet only in these ways does the act provide for sales. Did the

legislature intend interference with such articles? And if not, what is the proper construction to be given to the language in said Sec. 10? We have had occasion to notice heretofore the cardinal canon of construction, which is that the intent, when ascertained, governs, and to that all mere rules of interpretation are subordinate. (The State v. Bancroft, 22 Kan. 205.) The letter does not always express the intent. 'A thing which is within the intention of the makers of a statute, is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers; and such construction ought to be put upon it as does not suffer it to be eluded.' Holmes v. Carley, 31 N. Y. 290; Bacon's Abr. Statute 1, Secs. 5 and 10, and authorities cited.

The familiar illustration is that when it was enacted that whoever drew blood in the streets should be punished with the utmost severity, it was held not to include a surgeon who opened the vein of a person having a fit in the street. Plowden thus quaintly expresses the same thought in his commentary upon the case of Eyston v. Studd, 2 Plow. 465: 'It is not the words of the law, but the internal sense of it, that makes the law, and our law (like all others) consists of two parts, viz., of body and soul; the letter of the law is the body of the law, and the sense and reason of the law, *quia ratio legis est anira legis.* And the law may be resembled to a nut, which has a shell and a kernel within; the letter of the law represents the shell and the sense of it the kernel; and as you will be no better for the nut if you make use only of the shell, so you will receive no benefit from the law if you rely upon the letter; and as the fruit and profit of the nut lie in the kernel, and not in the shell, so the fruit and profit of the law consist in the sense more than in the letter. And it often happens that when you know the letter, you know not the sense; for sometimes the sense is more confined and contracted than the letter, and sometimes it is more large and extensive.' Doubtless the letter is first to be considered in order to determine the intent of the legislature, for the courts may not read a law simply as they wish it should read. But other matters may also be considered, and among them the evils sought to be remedied. It was resolved by the barons of the exchequer, in Heydon's case, 3 Rep. 7, as follows:

'For the sure and true interpretation of all statutes in general, be they penal or beneficial, restrictive or enlarging of the common law, four things are to be discerned and

considered: First. What was the common law before the making of the act? Second. What was the mischief and defect against which the common law did not provide? Third. What remedy the parliament hath resolved and appointed to cure the disease of the commonwealth? And Fourth. The true reason of the remedy.'

Now what was the evil sought to be remedied by this statute, and the constitutional amendment of which it was an outgrowth? It was the use of intoxicating liquors as a beverage. As counsel for defendants aptly and forcibly express it, ' the movement of which the amendment and the statute were the expression and the result, was not a crusade against cologne and the extract of lemon.' And in this connection we quote from the careful opinion prepared by the learned judge of the third judicial district, upon some of the cases now before us:

' The history of the movement which resulted in the adoption of the " prohibition amendment " and the enactment of the law now under consideration, and the object to be thereby secured, are too well known to give rise to any dispute. Those who voted for the amendment were not voting to prevent the use of articles common to toilet purposes or culinary use. It was no attack upon bay rum, camphor, or tincture of lemon; it was intended to strike at such liquors and mixtures only as were in ordinary and known use as intoxicating beverages, or which, in the failure to obtain such beverages, it could reasonably and fairly be believed would be used as substitutes. It seems that this intent and object of the law must be taken into consideration as an important element in its construction; and that while some particular preparation or " patent medicine " might possibly in a few cases, with a few exceptional constitutions, produce effects similar to intoxication—at an enormous risk of health or life, perhaps—the real question and test to which each " liquor " or " mixture " is to be submitted, is about this: " Is there reasonable danger that this will be used as—or as an equivalent substitute for—an intoxicating beverage ?" The law should receive a reasonable construction—equally removed on the one hand from a fanatical coloring, and on the other from a tendency to fritter it away.'

With these general considerations we pass to a decision of the particular question presented. It can not be doubted but that section 10 is broad and sweeping enough to bring within the statute every liquid which, by reason of the presence of alcohol, will produce intoxication, and this irrespective of the amount of alcohol contained, or the presence

of other ingredients of such a character as to prevent any use of the liquid as a beverage. But such was not the intent of the legislature in the act, and such therefore can not be adjudged to be its true import. And speaking for himself alone, the writer of this opinion does not hesitate to say that such a construction, if imperatively demanded by the language used, would carry the statute beyond the power of the legislature. I do not think the legislature can prohibit the sale or use of any article whose sale or use involves no danger to the general public. The habits, the occupation, the food, the drink, the life of the individual, are matters of his own choice and determination, and can be abridged or changed by the majority, speaking through the legislature, only when the public safety, the public health, or the public protection requires it. I do not think the legislature has the power to prohibit the raising or sale of corn, though out of it whisky may be obtained. No more do I believe that the legislature has the power to prohibit the sale of cologne, though alcohol be in it. The constitutional guaranty of 'life, liberty, and the pursuit of happiness,' is not limited by the temporary caprice of a present majority, and can be limited only by the absolute necessities of the public.

But the legislature never intended such a sweeping prohibition. The use of intoxicating liquors as a beverage was the evil, and the statute must be read in the light thereof. It intended to put a stop to such use, and limit the use to the necessities of medicine. Now the cases before us group themselves into three classes; and the same division is far-reaching and of general application. The first embraces what are generally and popularly known as intoxicating liquors unmixed with any other substances. Thus in one case the sale of brandy is charged. The second includes articles equally well known, standard articles, and which, while containing alcohol, are never classed as intoxicating beverages. Their uses are culinary, medical, or for the toilet. They are named in the United States Dispensatory and other similar standard authorities; the formulæ for their preparation are there given; their uses and character are as well recognized and known by their names as those of a horse, a spade or an arithmetic. The possibility of a different and occasional use does not change their recognized and established character. A particular spade may be fixed up for a parlor ornament, but the spade does not belong there. So, essence of lemon may contain enough alcohol to produce intoxication, more alcohol proportion-

ately than many kinds of wine or beer.    It is possible that a man may get drunk upon it, but it is no intoxicating liquor.    Bay rum, cologne, paregoric, tinctures generally, all contain alcohol, but in no fair or reasonable sense are they intoxicating liquors or mixtures thereof."

The court affirmed the action of the District Court in quashing the information for selling bay rum, tincture of gentian and extract of lemon, thereby holding as a proposition of law that lemon extract, though containing a larger percentage of alcohol than is to be found in whisky, is not an intoxicating liquor within the meaning of the statute.

The record fails to show that extract of lemon is an article in common use as a beverage, but does show that its common use is for culinary purposes and that the United States Dispensatory and other standard works giving its formula so classify it.

If the sale of the article is prohibited by the dram-shop act it may become a predicate for a suit for civil damages under the act.    If its sale does not fall within the prohibition of the statute it can not be a ground for recovery of damages under the statute.

In Holcomb v. The People, 41 Ill. App. 73, Mr. Justice Boggs, now of the Supreme Court of this State, delivering the opinion of the court, said:

" This is an appeal from a judgment imposing upon the appellant a fine for alleged unlawful sales of intoxicating liquors.    Counsel for the people in their brief say :  ' The case upon its merits presents a single issue, and that is whether extract of lemon may be sold without violating section 2 of the dram-shop act.'

An article generally and properly known and used for culinary purposes, recognized, and a formula prescribed for its preparation as such, in standard dispensatories prior to the enactment of the dram-shop act, and not then known and classed among liquors used as a beverage, is not, we think, to be deemed an intoxicating liquor within the meaning of the enactment, simply because it contains alcohol, and may, or in fact does, produce intoxication.

This view is supported by the cases collected in Vol. 37, American Reports, page 284.    (Intoxicating Liquor cases.) See also Black on Intoxicating Liquor, Chap. 1, Sec. 8.

Extract of lemon, it appears from the evidence, is such a preparation, and it is not to be deemed as within our statute, simply upon proof that it contains alcohol in sufficient quantity to produce and does produce, intoxication. There is no proof that the sale of extract of lemon, of which the appellant was convicted, were mere shifts or devices to avoid the penalties or evade the provisions of the dram-shop act."

The evidence in this case also fails to show that the sale was made as a shift or device to evade the provisions of the dram-shop act. The sale of lemon extract by a merchant in the ordinary course of his business, not made as a shift or device to evade the provisions of the dram-shop act and without intending it shall be used as a beverage and without knowing that it is contemplated by the purchaser that it is to be used for that purpose, and in the absence of proof that it is an article commonly used as a beverage, does not render the vender liable under the dram-shop act of this State. The test is, if the facts relied upon to constitute a cause of action for the recovery of damages for the loss of means of support, if proven beyond a reasonable doubt in a criminal prosecution for a violation of the statute by a person not having a license to keep a dram-shop, would not authorize a conviction, there can be no recovery of civil damages. In the civil suit a preponderance only of the evidence would be required to establish the plaintiff's case.

This court is unanimously of the opinion that the judgment of the trial court should be reversed. The writer of this opinion believes that it should be reversed without remanding.